The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence in this matter. Having considered all of the evidence the Full Commission affirms, with modifications, the Deputy Commissioners award of benefits and enters the following Opinion and Award.
***********
Based upon all of the competent evidence in the record and the reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who is fifty-six years and a college graduate, began working for defendant in approximately October 1995 as a security officer. Defendant J.D. White, a sole proprietor, conducted business as JDW ENTERPRISES and SAFEWAY PATROL SECURITY. The company has its home office in Fayetteville but at least twelve persons worked for the company in the Roanoke Rapids area.
2. As a security officer, plaintiffs job involved patrolling the areas to which he was assigned for the time periods on the weekly schedule. He patrolled on foot and was supposed to look for thieves, shoplifters, drunks and people who were too rowdy. He was usually assigned to an area on Fifth Street in Roanoke Rapids where there was a gas station and convenient store combination, a Laundromat and a car wash. He normally worked three nights per week over the weekends, and his average weekly wage was $112.50.
3. On March 17, 1997 plaintiff was on patrol when he noticed two men coming out of The Blue Flame, one of the businesses he was monitoring. They were loud, rowdy and appeared to be under the influence of alcohol or drugs. Plaintiff knew one of the men and spoke to him, telling him that they would have to leave the premises. While he was talking to one man, the other knocked him to the ground and kicked him in the face and left knee. As a result of the assault, plaintiff had multiple cuts, a black eye, broken eyeglasses, and a badly wrenched left knee. He went to the emergency room where his knee was x-rayed, his cuts were cleaned and he was given ice packs and medication.
4. Plaintiff had had previous problems with his left knee and had seen an orthopedic surgeon approximately one year before this incident for chronic swelling. Dr. Marsigli aspirated the knee and injected it with cortisone. Plaintiffs condition then improved to the point that he did not require further treatment. However, after he was assaulted on March 17, 1997, his knee swelled to twice its normal size. On March 27, 1997 he went to see Dr. Gross, his family doctor, who was not in the office that day. Consequently, he was advised to see an orthopedic surgeon in Rocky Mount. Accordingly, on March 24, 1997 he saw Dr. Nelson. On examination, Dr. Nelson noted severe effusion in the left knee and some swelling in the ankle. Plaintiff also still had a black eye and was using a cane to walk. The doctor aspirated the knee and prescribed medication. He saw plaintiff in follow-up on April 3, April 18 and April 30, 1997. The swelling and pain persisted despite treatment and plaintiff had to have the knee aspirated at each office visit. Consequently, he was sent for an MRI, which revealed villonodular synovitis, osteoarthritics and a meniscal tear. In view of the persistent symptoms and the MRI findings, Dr. Nelson recommended surgery.
5. On May 6, 1997 Dr. Nelson performed arthroscopic surgery to explore the knee for diagnostic purposes and then to repair the torn medial meniscus and to biopsy the hypertrophic synovial tissue found in the joint. When plaintiff next saw the doctor on May 14, 1997, he was advised that the tissue removed during the surgery was pigmented villonodular synovitis that was consistent with the prior history of swelling in the knee. Although much of the affected tissue had been removed during surgery, Dr. Nelson indicated that there might be enough tissue remaining to cause ongoing swelling. Aside from the specific swelling in plaintiffs left knee, the doctor also found generalized edema in both legs at that appointment, so he advised plaintiff to see Dr. Gross. He also aspirated the left knee and told plaintiff that he could start using the leg.
6. As instructed, plaintiff made an appointment with Dr. Gross and saw him on May 23, 1997. The evidence did not disclose the findings from that evaluation, but the doctor then ordered a venous doppler of plaintiffs left leg to rule out a possible blood clot. However, the test showed no evidence of venous disease. Dr. Gross prescribed diuretics for plaintiffs swelling and hypertension and also treated him for diabetes and congestive heart failure, conditions that had preexisted the injury in question. When plaintiff returned to Dr. Nelson on June 11, 1997, the edema was improved. Dr. Nelson prescribed a different anti-inflammatory medication but advised plaintiff that he would likely require a total knee reconstruction in the future. However, that prognostication applied to plaintiffs right knee, as well. He had had two operations to the right knee in the late 1980s and had continued to experience persistent symptoms.
7. Dr. Nelson released plaintiff to return to work effective June 23, 1997. When asked about restrictions some time in August, the doctor indicated that plaintiff should return to activity as tolerated without any restrictions. At some point, plaintiff did return to work but he quit after a short period because he did not think he could do the job properly. However, he apparently did not receive authorization from Dr. Nelson for his failure to continue working.
8. Dr. Nelson released plaintiff from medical care on September 3, 1997. As of that date, plaintiff only had mild effusion in the left knee and was walking without aids. He was rated with five-percent permanent partial impairment.
9. In July 1998 plaintiff returned to the doctor with complaints of recurrent pain and swelling in the left knee for the previous two weeks. Dr. Nelson aspirated and injected his knee and his symptoms improved, so the doctor released him from care on August 19, 1998. Plaintiff apparently tried to return to the doctor after that occasion for treatment of further symptoms, but the doctors staff would not let him keep the appointment due to outstanding medical bills.
10. Following the injury in question, some of plaintiffs medical bills were paid by Vardell Godwin Insurance Agency. (Plaintiff was of the impression that the insurance agency was being blamed by his employer for failing to obtain workers compensation insurance coverage.) The eyeglasses broken as a result of the incident were replaced by the assailant following his criminal conviction. However, most of plaintiffs medical bills were not paid and he received no compensation for the time he was out of work.
11. On March 17, 1997 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. The fact that he was assaulted constituted an unusual occurrence, which interrupted his regular work routine. The assault resulted directly from his job and not from other reasons.
12. As a result of this injury by accident, plaintiff was unable to work in any capacity from March 18 through June 22, 1997. Although he indicated that he was unable to perform his regular work duties after that date, Dr. Nelson placed no work restrictions on him. Consequently, he did not prove continuing disability.
13. Plaintiff sustained a five-percent permanent partial disability to his left leg as a result of this injury by accident.
14. Although plaintiff has been advised that further surgery is probable, it was not clear from the medical evidence whether that surgery would be a proximate result of the injury or solely due to the pigmented villonodular synovitis, which apparently preexisted the injury. Consequently, no finding is made at this time regarding the need for future surgery.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. As of March 17, 1997, defendant regularly employed more than three employees and was therefore subject to and bound by the provisions of the Workers Compensation Act. N.C. Gen. Stat. 97-2, 97-13.
2. An employer/employee relationship existed between defendant and plaintiff on March 17, 1997. N.C. Gen. Stat. 97-2.
3. On March 13, 1997 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. 97-2(6).
4. Plaintiff is entitled to compensation at the rate of $75.00 per week for thirteen and six-sevenths weeks for the temporary total disability he sustained as a result of this injury by accident. N.C. Gen. Stat. 97-29.
5. Plaintiff is entitled to compensation at the rate of $75.00 per week for ten weeks for the 5 percent permanent partial disability he sustained to his left leg as a result of this injury by accident. N.C. Gen. Stat.97-31(15) and (18).
6. Plaintiff is entitled to have defendant provide all medical compensation arising from this injury by accident, subject to the limitations of N.C. Gen. Stat. 97-25.1. N.C. Gen. Stat. 97-2(19),97-25, 97-25.1.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay compensation to plaintiff at the rate of $75.00 per week for thirteen and six-sevenths weeks for the temporary total disability he sustained as a result of this injury by accident. This compensation, totaling $1,039.29, has accrued and shall be paid in a lump sum.
2. Defendant shall pay compensation to plaintiff at the rate of $75.00 per week for ten weeks for his permanent partial disability. This compensation totaling $750.00 has also accrued and shall be paid in a lump sum.
3. Subject to the limitations of N.C. Gen. Stat. 97-25.1, defendant shall pay all medical expenses incurred by plaintiff as a result of this injury by accident when bills for the same have been submitted to defendant. Additionally, the following bills are hereby approved:
 Mileage expense to plaintiff for travel to Rocky Mount to see Dr. Nelson: $237.60
Lake Gaston Medical Clinic: $179.48
Nash Day Hospital: $3,014.91
Rocky Mount Orthop Sports Medicine: $2,365.95
4. Defendant shall pay the costs.
This 16th day of October 2000.
S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/_______________ CHRISTOPHER SCOTT COMMISSIONER
S/________________ DIANNE C. SELLERS COMMISSIONER